386 So.2d 31 (1980)
MIDLANTIC NATIONAL BANK, Appellant/Cross Appellee,
v.
COMMONWEALTH GENERAL, LTD., and Melvin Kaplan, Appellees/Cross Appellants.
No. 78-919.
District Court of Appeal of Florida, Fourth District.
July 2, 1980.
Rehearing Denied August 18, 1980.
*32 William E. Sadowski and Robert J. Schaffer of Helliwell, Melrose & DeWolf, Miami, for appellant/cross appellee.
Jack F. Weins of Abrams, Anton, Robbins, Resnick, Schneider & Mager, P.A., Hollywood, for appellees/cross appellants.
ANSTEAD, Judge.
This is an appeal by Midlantic National Bank from adverse provisions of a final judgment entered in an action involving numerous credit and loan transactions between the parties. We reverse.
Midlantic filed a complaint seeking by one count to recover from Commonwealth General the amount due on a promissory note, and by two other counts to recover from Melvin Kaplan on personal guaranties executed to secure payment of Commonwealth General's unpaid note and a debt of Commonwealth's subsidiary corporation, Commonwealth Silver Exchange, Inc.
Both defendants counterclaimed alleging that Midlantic had fraudulently induced Kaplan to pledge certain personal certificates of deposit to the bank in exchange for a promise by the bank to extend a line of credit to Commonwealth General. Kaplan sought to recover $200,000.00 of the pledged certificates applied by the bank to pay other loans in default, and Commonwealth sought to recover damages for the entire loss of its business allegedly due to the bank's failure to fund the line of credit. Kaplan also sought punitive damages from the bank.
Following the conclusion of a two day jury trial, the jury, after Midlantic's motions for directed verdict were denied, returned verdicts, upon which judgment was entered, awarding Midlantic $43,044.98 against Commonwealth General and $31,820.82 against Kaplan as to his guaranty of the debt of Commonwealth Silver Exchange, Inc. Recovery against Kaplan on the guaranty of Commonwealth's note was denied. The jury also awarded $100,000.00 plus $25,000.00 punitive damages to Kaplan and $200,000.00 to Commonwealth General against Midlantic on their counterclaims.
The parties had done business with each other for many years. In July of 1975, *33 Commonwealth General and two of its subsidiaries, Commonwealth Silver Exchange, Inc. and Comwel Development Corp., all corporations controlled by Kaplan, were in need of additional financing. Numerous loans by the bank to Kaplan and the corporations were then outstanding. Kaplan informed the bank of the need for additional financing and requested a $400,000.00 unsecured line of credit. The bank ultimately agreed to extend a $400,000.00 line of credit to Kaplan, $100,000.00 of any future loans made under the line to be unsecured, and $300,000.00 of any such loans to be secured by Kaplan's personal certificates of deposit previously purchased by Kaplan from Midlantic. No commitment fee was paid for the line of credit and no written agreements were made as to the terms of the line of credit.
Subsequently, Midlantic lent monies to Kaplan and Kaplan executed notes therefor, under the line of credit, with the knowledge of the bank that the monies borrowed would be funded to Commonwealth General and then disbursed to the financially troubled subsidiaries. Kaplan repaid $100,000.00 of his borrowing and a $100,000.00 certificate given as security was released to him. In addition, separate loans, not involving the line of credit, were made to Commonwealth. In September of 1975, Midlantic was notified that Commonwealth Refining Company Limited, a subsidiary of Commonwealth General, had gone into bankruptcy. As a result, the bank refused to authorize any further loans to Kaplan under the line of credit. Subsequently, upon the bank's request, Kaplan executed unlimited personal continuing guaranties for the loans of Commonwealth General and its subsidiary, Commonwealth Silver Exchange, Inc. When two of Kaplan's certificates of deposit with the bank in the total amount of $200,000.00 matured, the bank applied the proceeds of the certificates against outstanding unpaid loans due from Kaplan and Commonwealth General. Two other loans, subjects of the bank's lawsuit here, remained unpaid.
A line of credit is a limit of credit to cover a series of transactions. Frell v. Dumont-Florida, Inc., 114 So.2d 311 (Fla. 3d DCA 1959); Pittinger v. Southwestern Paper Co., 151 S.W.2d 922 (Tex.Civ.App. 1941). Also see Grandin Indus., Inc. v. Florida Nat. Bank at Orlando, 267 So.2d 26 (Fla. 4th DCA 1972). It does not impart upon the bank the legal responsibility to loan up to the limit or a responsibility of the lender to borrow up to the limit, but merely facilitates the easier extension of credit.[1] Accordingly, if information later comes to light which reflects upon a borrower's ability to satisfy his debts, a bank need not fund the entire line of credit.
*34 Kaplan's counterclaim alleges that by advising him that the purpose of the pledge was for the advance of credit to Commonwealth General, the bank fraudulently induced him to pledge his certificates of deposit, when in fact the purpose of the pledge was to make the certificates of deposit available to the bank as security against other loans made to Kaplan's corporations. However, at trial no evidence was presented as to any fraud or false representations made by the bank to secure the certificates as collateral. To the contrary, the bank agreed to and did initially fund the line of credit. There was no evidence presented indicating the bank secured the certificates as security knowing then that it was going to subsequently terminate the line of credit and apply the certificates to other loans guaranteed by Kaplan.[2] In short, we do not believe Kaplan presented sufficient competent evidence to allow his claim to go to the jury.[3] In addition, of course, we must set aside the award of punitive damages which was based on the same allegations of fraud.
The counterclaim of Commonwealth General alleged that the bank had made and breached an agreement to extend the line of credit to Commonwealth General and that as a result of the breach Commonwealth was unable to meet its financial obligations and went out of business. First, we believe that the proof establishes that the line of credit was extended to Kaplan, not Commonwealth or its subsidiaries. The fact that the funds borrowed under the line of credit went to Commonwealth and its subsidiaries is not sufficient to establish that the line was extended to Commonwealth, especially, in view of the direct evidence to the contrary. More importantly, the bank was under no legal obligation to completely fund the line of credit, regardless of whether it was extended to Kaplan or Commonwealth. As noted previously, neither party is lawfully bound to loan or borrow the maximum amount provided for in a line of credit. Absent some other contractual arrangement, and there is no evidence that the bank entered into any other such arrangement, the bank was within its rights when it terminated the line of credit. Grandin Indus., Inc., supra.
We also believe that the bank was entitled to a directed verdict on Count II of its complaint. The bank established its right to recover under Kaplan's guaranty and there is no evidence to support Kaplan's defenses of failure of consideration or fraudulent inducement. See Gibbs v. American National Bank of Jacksonville, 155 So.2d 651 (Fla. 1st DCA 1963) and Ostreyko v. B.C. Morton Organization, Inc., 310 So.2d 316 (Fla. 3d DCA 1975).
Finally, the bank contends that the lower court abused its discretion by denying its claim for a new trial on damages under Counts I and III of the complaint because of the failure of the jury to award it interest on its liquidated claims. At oral argument appellees candidly conceded that the bank was entitled to interest and stipulated that an additur could be entered.
The bank has alleged that other substantial errors occurred in the proceedings below, but in view of our conclusions discussed above we do not find it necessary to reach those issues.
In conclusion, the final judgment in favor of Kaplan and Commonwealth General on their counterclaims against Midlantic Bank are hereby reversed and remanded with directions that judgment be entered in favor of Midlantic, and the judgment for Kaplan under Count II of Midlantic's complaint is reversed with directions that judgment be *35 entered in favor of Midlantic for the appropriate principal and interest. Finally, the trial court is directed to enter an additur for interest to the judgments recovered by Midlantic under Counts I and III of its complaint.
LETTS, C.J., and DOWNEY, J., concur.
NOTES
[1] The parties have not been able to supply us with a definition for a line of credit. However, two that we have found from trade publications are set forth:

Although definitions vary, it is useful for banks to distinguish lines of credit from commitments. A line of credit is a specified amount that can be borrowed from time to time and that can be cancelled by either party at any time. Every line carries a specific internal review date and is reviewed at least annually. A commitment, on the other hand, is defined as an agreement signed by both borrower and lender for a specified amount and for a definite period  not to be cancelled except under the conditions set forth in the agreement. Every commitment must have a stated expiration date. For this assurance of credit availability, the bank's customer pays a fee. Whenever a credit line or commitment is in effect, a loan can be made any time thereafter at the request of the borrower. Bank Administration Institute, Bank Administration Manual Volume I
An agreement between a bank and a customer whereby the bank agrees, over a future period, to lend the customer funds up to an agreed maximum amount. The bank has the option to withdraw from the agreement if the financial status of the borrower changes, or if the borrower fails to use the line of credit for its intended use as per the agreement. The customer may borrow as much of the "line" as is required and pays interest on the borrowed portion only. A line of credit is widely used by large organizations for the future commitments and purchases of inventory. The bank is fully entitled to periodic financial reports from the borrower so as to be constantly informed on his credit status.
NCR, Financial Terminology
[2] That right was one given to the bank by virtue of the continuing guaranties, which gave the bank a general lien upon any of Kaplan's assets which were in the bank's custody and control including the certificates of deposit which matured long after the bank terminated the line of credit.
[3] In their brief the appellees appear to suggest that both Commonwealth's and Kaplan's counterclaims are actually predicated upon the breach of a separate oral agreement to lend money. However, our examination of the record reflects a complete absence of proof as to the terms, much less the breach, of any such agreement.